


U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____

**United States Bankruptcy Judge**

**Signed March 16, 2011**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| NEAL MATTHEW QUIGLEY, | § | CASE NO. 09-43357-DML |
| | § | |
| Debtor. | § | CHAPTER 7 |
| | § | |

---

| | | |
|---|---|---|
| KIMBERLY L. ARNOLD, *et. al.*, | § | |
| | § | |
| Plaintiffs, | § | ADVERSARY NO. 09-04317-DML |
| | § | |
| v. | § | |
| | § | |
| NEAL MATTHEW QUIGLEY, *et. al.*, | § | |
| | § | |
| Defendants. | § | |

1

**MEMORANDUM OPINION**

Before the court are the *Second Amended Complaint* (the "Arnold Complaint"), docket no. 30, filed by Kimberly Arnold ("Arnold") and Jon Ireland ("Ireland," and with Arnold, "Plaintiffs") against Neal Matthew Quigley ("Quigley"), DLB Leasing – Dov Safir, Inc. ("DLB"), and Moon Shadow Investments ("Moon Shadow," and with Quigley and DLB, "Defendants"); the *Original Answer of Moon Shadow Investments*, docket no. 46, filed by Moon Shadow; the *Answer of DLB Leasing/Dov Safir, Inc. to Second Amended Complaint of Kimberly Arnold and Jon Ireland*, docket no. 40, and the *Original Complaint of Intervenor*, docket no. 25, both filed by DLB; the *Answer to Complaint of Intervenor*, docket no. 36, filed by Plaintiffs; and the *Original Answer to Plaintiffs' Second Amended Complaint and Counterclaim in the Alternative*, docket no. 37, and the *Original Answer to Original Complaint of Intervenor*, docket no. 38, both filed by Quigley.  The court held a hearing (the "Hearing") on these matters on January 11, 2011.  At the Hearing, the court heard testimony from Arnold, Ireland, Mark Petrocchi ("Petrocchi"), Dov Safir ("Safir"), and Jim Cooper ("Cooper").  The court also received into evidence several exhibits offered by Plaintiffs and DLB.  These exhibits are identified as necessary below.[1]

This adversary proceeding is subject to the court's jurisdiction.  28 U.S.C. §§ 1334 and 157(c)(2).  This memorandum opinion constitutes the court's findings of fact and conclusions of law.  FED. R. BANKR. P. 7052.

**I.  Background**

---

[1]     Both Plaintiffs' and Defendants' exhibits were identified by number; therefore, the court will refer to exhibits as, e.g., "Plaintiffs' exhibit 1" or "Defendants' exhibit 1."

The convoluted events leading to this adversary proceeding are the result of the fact that Neal Matthew Quigley is, simply put, a crook, a scoundrel, a rapscallion, a chiseler.[2]  Several years prior to her unfortunate introduction to Quigley, Arnold and her late husband Gary D. Arnold ("Gary Arnold," and with Arnold, the "Arnolds") purchased a home located at 220 Ashmore Place, Haslet, TX 76052 (the "Property") from Rosewood Homes.  Pursuant to a general warranty deed executed on February 2, 2004, Rosewood Homes conveyed the Property to the Arnolds, who paid for it outright.[3]  Arnold has lived at the Property ever since, except for brief periods when she could not afford to pay the utilities there, during which time she stayed with family or friends.[4]

Following the death of Gary Arnold, Arnold experienced financial difficulties.  At some point, Arnold sought the assistance of Sam Taylor ("Taylor"), an attorney, on a criminal matter unrelated to this case.  Taylor unwisely suggested Arnold contact Quigley for help with her financial situation.[5]  Quigley agreed to give Arnold a home equity loan in the amount of $50,000, secured by the Property, with the understanding that Arnold would sell the Property to repay her obligation.  Arnold signed a promissory note (the "Arnold Note") for $50,000 and executed a deed of trust (the "Arnold Deed of Trust") with respect to the Property in favor of Quigley on or about November 26, 2007.  Arnold did not receive any funds at that time.  The Arnold Deed of Trust appointed Mark A. Rodriguez ("Rodriguez") as trustee.  The Arnold Note had a maturation date of May 26, 2008, and called for a one lump sum payment due on that date.  The Arnold

---

[2]     Quigley was incarcerated at the time of the Hearing, and thus did not testify.

[3]     Gary Arnold died on November 12, 2005.

[4]     Arnold testified that both of her dogs remained at the Property during these intermittent periods and she visited the Property every day to care for them.

[5]     Presumably, Taylor knew that Arnold was having financial difficulties and referred her to Quigley for a loan.  Taylor and Quigley had prior business relationships.

Note also specified that non-judicial foreclosure would occur in the event of default. Arnold never received a copy of the final loan application (or even filled one out), nor did the Arnold Note state that the loan was an extension of credit under section 50(a)(6) of article XVI of the Texas Constitution.

Approximately one week after the execution of the Arnold Note and the Arnold Deed of Trust, Quigley contacted Arnold and requested she meet him at Taylor's office.[6] Quigley gave Arnold $10,000 in the parking lot of Taylor's office. After Arnold left the parking lot, Quigley purportedly proceeded into Taylor's office to pay $7,500 on Arnold's behalf for legal work the attorney had performed in conjunction with Arnold's prior criminal matter.[7]

During the next few months, Arnold attempted to contact Quigley on numerous occasions to receive the balance of the $50,000 loan. Quigley finally paid Arnold the remaining balance, but only after she signed a loan modification agreement (the "Modification Agreement"), which was executed on January 16, 2008. The Modification Agreement provided that the Arnold Note would become due on January 10, 2009, and that the amount to be repaid would be $55,000, not $50,000.

On July 14, 2008, and unbeknownst to Arnold, Quigley substituted Taylor in place of Rodriguez as substitute trustee for the Arnold Deed of Trust. Quigley then assigned the Arnold Note to Moon Shadow Investments ("Moon Shadow") on September 15, 2008, and Moon Shadow recorded the assignment (the "Assignment") on September 22, 2008. Arnold had no knowledge of the Assignment at that time.

---

[6] The record suggests Taylor may have been the closing attorney for the transaction by which Arnold executed the Arnold Note and the Arnold Deed of Trust, though it is not clear that Taylor did indeed perform that role.

[7] The $7,500 Quigley purportedly paid to Taylor on Arnold's behalf was part of the proceeds of the $50,000 loan Quigley provided Arnold.

Meanwhile, Arnold had begun to market the Property for sale, intending to use the proceeds from the sale to pay off the Arnold Note. Ireland, with full knowledge of the Arnold Note and the Arnold Deed of Trust, tendered an offer to purchase the Property on October 6, 2008. Arnold informed Quigley about the possible sale and Quigley made no objections, though he failed to inform Arnold of the Assignment, or that he had substituted Taylor for Rodriguez as trustee. On October 7, 2008, after Ireland and Arnold had entered into a contract for sale, Quigley foreclosed on the Property (the "Foreclosure").[8]  Though Taylor was now listed as substitute trustee of the Arnold Deed of Trust, Quigley executed the substitute trustee's deed (the "Substitute Trustee's Deed") conveying the Property to himself. Ireland discovered the Foreclosure only after he checked the real property records and found that the Property was now listed under Quigley's name instead of Arnold's. Arnold never received any notice of default or foreclosure from Quigley and knew nothing of the Foreclosure.

In December of 2008, Quigley contacted DLB, a company owned and operated by Safir with operations based in Arizona, to obtain a loan.[9]  Quigley told Safir that he had free and clear property and was seeking a large loan. Quigley sent Safir pictures of the Property, as well as documents suggesting that a tenant named "Melissa Poornich" lived there and paid monthly rent. In January of 2009, Safir came to Texas to see the Property. When Quigley and Safir visited the Property, Arnold answered the door and Quigley introduced her to Safir as "Kimberly Arnold." Quigley then falsely introduced Safir as his insurance agent, something Safir did not deny.[10]

---

[8]        Quigley foreclosed a full three months before the Arnold Note was due on January 10, 2009.

[9]        DLB posts online ads on "Craigslist" offering loans to persons with property free of encumbrances.

[10]        On another occasion, Safir accompanied Quigley to a meeting with Ireland. Once again, Quigley introduced Safir as his insurance agent and Safir did not correct the misrepresentation. Quigley had apparently informed Safir prior to the meeting that Ireland was trying to steal the Property from Quigley. During the meeting Ireland implored Quigley to put the Property back in Arnold's name so Ireland could

Arnold became uncomfortable when Quigley and Safir started taking pictures of the Property, and told them they had to leave.[11]

Safir agreed to loan Quigley approximately $124,000 secured by the Property. Quigley executed a deed of trust (the "DLB Deed of Trust") in favor of DLB effective January 7, 2009, and a promissory note (the "DLB Note") in favor of DLB effective January 13, 2009. The DLB Deed of Trust was recorded in the Tarrant County Deed Records. DLB also purchased a title insurance policy issued by Lawyers Title Insurance Corporation ("Lawyers Title") in the amount of $120,000. The policy was dated February 5, 2009, and listed Quigley as holding title to the Property.

When neither Moon Shadow nor DLB received payment on their respective promissory notes, they began foreclosure proceedings against the Property, though neither actually foreclosed. Meanwhile, on March 16, 2009, Plaintiffs instituted an action against Quigley in the 67th District Court of Tarrant County (the "State Court Action") seeking a declaration that, as to Quigley, Arnold held superior title to the Property. Quigley filed for bankruptcy on June 2, 2009. On June 23, 2009, Plaintiffs filed their *Motion to Lift Stay to Conclude a Pending Civil Action, or Alternatively, Request for Adequate Protection* (the "Lift Stay Motion") in Quigley's bankruptcy case, in which they asked the court to, among other things, permit them to proceed with the State Court Action. The court held a hearing on the Lift Stay Motion on July 23, 2009,

---

purchase it. Safir did not speak, save to ask how much Ireland was paying for the Property. At this point, Ireland became suspicious of Safir.

[11] The testimony admittedly differs greatly as to what occurred when Quigley and Safir visited the Property. Arnold maintains she met Safir on this visit, and Safir claims no one answered the door when he rang the doorbell. The court finds Arnold's testimony to be more credible, in part because Safir and Quigleys' relationship is puzzling. Safir apparently stayed at Quigley's home on one of his trips to Texas, and paid Quigley's gas bill and some of Quigley's wife's medical expenses. Quigley also gave Safir a Mercedes-Benz as an initial payment on the loan Safir provided him.

at which the parties agreed to remove the State Court Action to this court. This adversary resulted.

## II. Discussion

In this adversary proceeding, Arnold and Ireland take the position that the Arnold Note and the Arnold Deed of Trust were executed in violation of article XVI of the Texas Constitution, and are therefore void. Moon Shadow seeks to enforce Quigley's assignment of the Arnold Note and the Arnold Deed of Trust, arguing that Moon Shadow is a good faith purchaser for value and therefore owns the obligation under the Arnold Note. DLB argues that it stands as a bona fide purchaser for value with a superior interest in the Property as a result of the DLB Note and the DLB Deed of Trust. Quigley asserts a counterclaim against DLB, arguing that the DLB Note and the DLB Deed of Trust were usurious under the TEXAS BUSINESS AND COMMERCE CODE and the TEXAS FINANCE CODE, in that DLB attempted to collect money from Quigley in excess of the allowable statutory interest rate. Quigley also asserts a counterclaim against Arnold, arguing that he is entitled to repayment of the $50,000 he lent Arnold plus interest, costs, and attorney's fees, or in the alternative, a minimum $50,000 claim against Arnold and/or the Property. The court will address each of these arguments in turn.

### A. The execution of the Arnold Note and the Arnold Deed of Trust violated section 50(a)(6) of the Texas Constitution and Quigley therefore forfeited all principal and interest owing under the Arnold Note.

Article XVI, section 50(a)(6) of the Texas Constitution sets forth the requirements by which a lender can obtain an enforceable lien against a homestead by means of a home equity loan. Plaintiffs assert that the Property is Arnold's homestead. Since, according to Plaintiffs, the Arnold Note and the Arnold Deed of Trust did not comply with section 50(a)(6)'s requirements, Quigley never obtained an enforceable lien against the Property, and the Arnold Note and the

Arnold Deed of Trust are void.  To assess this argument, the court must first determine whether the Property is Arnold's homestead.

Section 41.002(a) of the TEXAS PROPERTY CODE provides: "If used for the purposes of an urban home . . . the homestead of a family or a single, adult person . . . shall consist of not more than 10 acres of land which may be in one or more contiguous lots, together with any improvements thereon."  No party contends that the Property does not fall within the definition of an urban homestead as defined in section 42.001 of the TEXAS PROPERTY CODE.

"To establish homestead rights, [a] claimant must show [a] combination of both overt acts of homestead usage and intention on part of the owner to claim land as a homestead." *Sanchez v. Telles,* 960 S.W.2d 762, 770 (Tex. App.—El Paso 1997, pet. denied); *see also Gregory v. Sunbelt Sav., F.S.B.*, 835 S.W.2d 155, 158 (Tex. App.—Dallas 1992, writ denied) (person claiming homestead exemption must prove concurrent usage of property and intent to occupy property as homestead).  The party claiming the homestead exemption has the burden of establishing the homestead character of the property.  *See Sanchez*, 960 S.W.2d at 770; *Gregory*, 835 S.W.2d at 158.  Possession and use of land by one who owns it and who resides upon it makes it the homestead in law and in fact.  *See Sanchez*, 960 S.W.2d at 770; *NCNB Texas Nat'l Bank v. Carpenter*, 849 S.W.2d 875, 880 (Tex. App.—Fort Worth 1993, no writ).

Once a homestead is established, it is presumed to continue, and a party asserting otherwise has the burden of proving abandonment.  *See Churchill v. Mayo*, 224 S.W.3d 340, 345 (Tex. App.—Houston [1st Dist.] 2006, pet. denied); *Duran v. Henderson*, 71 S.W.3d 833, 842 (Tex. App.—Texarkana 2002, pet. denied).  Abandonment of a homestead occurs when a homestead claimant ceases to use the property, intending not to use it as a home again.  *See Churchill*, 224 S.W.3d at 345; *Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 808 (Tex.

8

App.—Austin 2004, pet. denied). Moving from homestead property due to health reasons is not sufficient to show abandonment. *See Churchill*, 224 S.W.3d at 345 (citing *Morris v. Porter*, 393 S.W.2d 385, 390 (Tex. Civ. App.—Houston 1965, writ ref'd n.r.e.)).

The court finds that Arnold has met her burden to show that she established the Property as her homestead. Arnold, along with Gary Arnold, acquired title to the Property in February 2004. With the exception of a few intermittent periods during which she stayed with family and friends because she could not afford to pay the utility bills for the Property, Arnold has lived at the Property since the purchase. As of August 23, 2008, a Tarrant County Appraisal Report listed Arnold as the owner of the Property and listed "general homestead" under "exemptions." Arnold owned no home other than the house on the Property. The court thus finds that Arnold displayed overt acts of homestead usage and intended to claim the Property as her homestead.

Nor is there evidence in the record to support the conclusion that Arnold abandoned the Property as her homestead, particularly given the presumption that, once established, the homestead continues. Even when she stayed elsewhere, Arnold's dogs remained at the Property, and she returned there every day to care for them. There is no evidence Arnold left the Property never intending to use it again. Moreover, if moving from property for health reasons does not constitute abandonment under Texas law, then staying briefly with friends or family because one cannot pay utilities, while one's pets remain behind at the homestead, does not constitute abandonment either. The court finds therefore that Arnold never abandoned the Property after establishing it as her homestead, and thus the Property remains Arnold's homestead.

Having determined that the Property is in fact Arnold's homestead, the court must consider whether the Arnold Note and the Arnold Deed of Trust complied with article XVI, section 50(a)(6) of the Texas Constitution. Section 50(a)(6), appended in full to this

9

memorandum opinion, provides a list of requirements which a home equity loan must meet to be

valid and enforceable against homestead property. Among other requirements, Paragraph D

mandates that the lien securing the home equity loan be capable of being foreclosed only through

a court order; Paragraph P provides an exclusive list of six "persons" authorized to make home

equity loans; and Paragraph Q sets forth various conditions which must accompany the loan. Of

these conditions, two are particularly relevant for this opinion: (x) provides that a lender or

holder of a note shall forfeit all principal and interest on the note if the lender or holder fails to

comply with its obligations with respect to the home equity loan and also fails to cure any

deficiency by taking one or more of six enumerated actions within 60 days of being notified of

the deficiency; and (xi) provides that a lender or holder shall forfeit all principal and interest if

the lender is not a person authorized to make home equity loans under Paragraph P.[12]

---

[12]   Strictly speaking, section 50(a)(6)'s language does not mandate a lender or holder of a note forfeit all
principal and interest if the lender fails to comply with the section's requirements. Section 50(a)(6) sets out
a list of requirements which must be satisfied for a home equity loan to be enforceable against a homestead.
Paragraph Q requires that the loan be made "on the condition that," among other things, the lender or any
holder of a note forfeit all principal and interest if the lender fails to comply with section 50(a)(6) and also
fails to cure any defects within 60 days of receiving notice from the borrower, *see* Paragraph Q(x), or if the
lender is not a person who falls into one of the six categories of persons authorized to make home equity
loans by Paragraph P, *see* Paragraph Q(xi).

Read literally, section 50(a)(6)(Q) states that, for a loan to be enforceable against homestead property, a
lender must make the loan on the condition that the lender forfeit principal and interest should the lender
not comply with its obligations and timely cure any deficiencies, and on the condition that the lender forfeit
principal and interest if the lender is not authorized to make the loan. A lender that *complies* with
Paragraph Q and conditions the home equity loan accordingly will forfeit principal and interest if the lender
violates one of those two conditions. On the other hand, according to a literal reading of section 50(a)(6), a
lender that *fails* to comply with section 50(a)(6) by lending without conditioning the loan so that the lender
forfeit principal and interest if it fails to comply with its obligations and cure any deficiencies, or if it is not
an authorized lender, does not forfeit principal and interest if the lender fails to comply with its obligations
under section 50(a)(6). Such lender has merely made a home equity loan which may not be enforced
against a homestead. Presumably, since section 50(a)(6)'s language does not expressly *void* such a loan,
the loan might be enforceable against, for example, property to which a person retains title after
abandoning it as a homestead, or against a guarantor.

Recent opinions from the Court of Appeals for the Fifth Circuit and the Texas Supreme Court, however,
assume that a lender or a holder of a note forfeits all principal and interest no matter what if the lender or
holder fails to comply with section 50(a)(6) (and fails to cure any deficiencies according to Paragraph Q(x),
if applicable). *See Cerda v. 2004-EQR1 L.L.C.*, 612 F.3d 781, 786 (5th Cir. 2010) ("Among the limitations
placed on [home equity lending by section 50(a)(6)] is the requirement that lenders forfeit all principal and

Applying the Texas Constitution to the facts in the record, the court concludes that the Arnold Note and the Arnold Deed of Trust failed to comply with numerous requirements in section 50(a)(6). The Arnold Note called for non-judicial foreclosure in the event of default, which violates Paragraph (D)'s requirement that a home equity loan be "secured by a lien that may be foreclosed upon only by a court order." Quigley was not a certified Texas mortgage broker or any other certified lender under Paragraph (P). Arnold never received a copy of the final loan application or any other documents she signed at closing, as required by Paragraph (Q)(v). Neither the Arnold Note nor the Arnold Deed of Trust disclosed that the loan was the type of extension of credit to which section 50(a)(6) applies, as required by Paragraph (Q)(vi). Nor did the Arnold Note or the Arnold Deed of Trust contain an assurance that Arnold could rescind the loan within 3 days without penalty, as mandated by Paragraph (Q)(viii). Finally, Quigley and Arnold never signed a written acknowledgment as to the fair market value of the Property in accordance with Paragraph (Q)(ix).

By failing to comply with section 50(a)(6)'s requirements, Quigley forfeited all principal and interest owing under the Arnold Note, as mandated by Paragraph (Q)(x) and (xi). With respect to Paragraph (Q)(x), Arnold put Quigley on notice regarding his section 50(a)(6) violations by, at the latest, March 23, 2010, when she filed the Arnold Complaint. Nothing in the record suggests Quigley took action to cure any of these violations at any time, let alone within

---

interest if they fail to cure violations of their obligations."); *LaSalle Bank Nat'l Assoc. v. White*, 246 S.W.3d 616, 618 n.3 (Tex. 2007) (per curiam) ("When a home-equity loan violates the terms of section 50(a)(6), section 50(a)(6)(Q)(x) provides that the lender forfeits the principal and interest . . . ."); *see also* REGULATORY COMMENTARY ON EQUITY LENDING PROCEDURES, October 7, 1998, at 2, *available at* http://www.occc.state.tx.us/Pubdocs/HomeEquity/Cmnt_109.pdf ("A lender or holder's failure to comply with the requirements [of section 50(a)(6)] may result in forfeiture of all principal and interest on the loan if the lender or holder fails to comply with its obligations within a reasonable time after being notified by the borrower of the failure to comply."). The court must construe section 50(a)(6) in accordance with these precedents.

sixty days of March 23, 2010.  Quigley therefore forfeited all principal and interest owing under the Arnold Note pursuant to Paragraph (Q)(x).

Paragraph (Q)(xi) provides that a lender shall forfeit all principal and interest if the home equity loan is made by a person other than those described in Paragraph P, which sets forth six categories of persons authorized to make home equity loans under Texas law.  Unlike Paragraph (Q)(x), Paragraph (Q)(xi)'s language does not provide lenders with a cure period.  There is no dispute that, at least during the time period relevant to the case at bar, Quigley did not fit within one of the six categories of persons authorized by Paragraph (P) to make home equity loans. Therefore, Quigley forfeited all principal and interest owing under the Arnold Note pursuant to Paragraph (Q)(xi) as well.  Accordingly, Quigley's counterclaim, by which he asserts he is entitled either to repayment of $50,000 plus interest, costs, and attorney's fees, or to a minimum $50,000 claim against Arnold and/or the Property, fails.

**B. Because Quigley was not a person authorized to make loans under Paragraph (P) of section 50(a)(6), Moon Shadow forfeited all principal and interest as holder of the Arnold Note.**

Moon Shadow asserts that it is a good faith purchaser for value with respect to the Arnold Note, and therefore owns any obligations due under it.  But Paragraph (Q)(xi) states that a *holder of a note* forfeits all principal and interest if the *lender* is not a person authorized under Paragraph P to make home equity loans.  Assuming for sake of argument only that the Arnold Note would otherwise be a valid obligation, Moon Shadow would forfeit all principal and interest due under the Arnold Note merely because *Quigley* was not a person authorized to make home equity loans under Paragraph P.

Even if Paragraph Q(xi) did not expressly prohibit a holder from collecting a loan made by an unauthorized person, Moon Shadow would still be unable to enforce the Arnold Note.  The

Arnold Note was void as to Quigley, and as assignee, Moon Shadow could not have greater rights under the Arnold Note than did Quigley, even if Moon Shadow could otherwise satisfy the requirements for bona fide purchaser status.[13]   *See BP Am. Prod. Co. v. Marshall*, 288 S.W.3d 430, 463 (Tex. App.—San Antonio 2008, pet. granted) (when lease terminated, company had nothing to convey to party claiming bona fide purchaser status, and thus party could not successfully raise bona fide purchaser defense); *Rio Bravo Oil Co. v. McEntire*, 95 S.W.2d 381, 388 (Tex. 1936) (company could not be innocent purchaser of oil and gas rights since lessor had no title and company took under lease only such title as lessor had).

### C.  DLB is not a bona fide purchaser with a superior interest in the Property.

The court must next determine whether DLB is a bona fide purchaser with a superior interest in the Property as a result of the DLB Note and the DLB Deed of Trust.  For reasons explained below, the court concludes DLB is not a bona fide purchaser.

### 1.  DLB could not acquire bona fide purchaser status, as one of the links in the chain of title is a forgery.

Under Texas law, the execution of a deed of trust severs the legal and equitable estates. *See Flag-Redfern Oil Co. v. Humble Exploration Co., Inc.*, 744 S.W.2d 6, 8 (Tex. 1987).  Legal title remains with the mortgagor while equitable title transfers to the mortgagee.  *See id.*  Legal title therefore remained with Arnold after the execution of the Arnold Note and the Arnold Deed of Trust.

To transfer an interest in real property under Texas law, the conveyance must be "in writing and must be subscribed and delivered by the conveyor or by the conveyor's agent authorized in writing."  TEX. PROP. CODE § 5.021 (Vernon 2003); *see also Adams v. First Nat'l*

---

[13]     This is not to say that Moon Shadow is without a remedy.  Because Quigley endorsed the Arnold Note when he assigned it to Moon Shadow and did so without limiting recourse, Moon Shadow may recover under the Arnold Note from Quigley (independent of any cause of action Moon Shadow may have against Quigley for fraud or otherwise).

*Bank of Bells/Savoy*, 154 S.W.3d 859, 869 (Tex. App.—Dallas 2005, no pet.).  Therefore, for the Foreclosure to transfer legal title to the Property to Quigley, the substitute trustee for the Arnold Deed of Trust (Taylor) was required to execute and deliver the Substitute Trustee's Deed to Quigley.

A person cannot obtain bona fide purchaser status under Texas law when one of the links in the chain of title is a forgery.  *See Bellaire Kirkpatrick Joint Venture v. Loots*, 826 S.W.2d 205, 210 (Tex. App.—Fort Worth 1992, writ denied) (joint venturers could not obtain bona fide purchaser status with a forged deed in their chain of title); *Dyson Descendant Corp. v. Sonat Exploration Co.*, 861 S.W.2d 942, 947 (Tex. App.—Houston [1st Dist.] 1993, no writ) (forged deed is void *ab initio* and no person can be an innocent purchaser of land where a link in the chain of title is a forgery); *Commonwealth Land Title Ins. Co. v. Nelson*, 889 S.W.2d 312, 318 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (stating same).  Though Taylor, as substitute trustee of the Arnold Deed of Trust, was required to sign the Substitute Trustee's Deed, Quigley executed it instead, effectively conveying the Property to himself.  The record contains no evidence that Quigley had authority to do so.  As proper execution of the Substitute Trustee's Deed was required to pass legal title to the Property to Quigley, Quigley's unauthorized signature rendered the Substitute Trustee's Deed a forgery.  And because the forged Substitute Trustee's Deed is a link in the chain of title from Quigley to DLB, DLB could not acquire bona fide purchaser status with respect to the Property.

Nor is the forged Substitute Trustee's Deed the only reason the Foreclosure – and by extension, the DLB Note and the DLB Deed of Trust – is invalid.  Though the Texas Constitution does not allow foreclosure of a deed of trust securing a home equity loan other than by court order, *see* TEX. CONST., art. XVI, § 50(a)(6)(D), the Foreclosure was conducted without

14

one.  Even assuming a court order was not required to foreclose on the Property – which it was –
the Foreclosure failed to satisfy the requirements for a valid non-judicial foreclosure.  Quigley
provided no notice to Arnold as required by section 51.002 of the TEXAS PROPERTY CODE, and
foreclosed three months before the Arnold Note became due.  He also assigned the Arnold Note
and the Arnold Deed of Trust to Moon Shadow prior to the Foreclosure (an assignment of
record, and thus of which DLB – and Lawyers Title – had constructive notice), and therefore had
no right to foreclose on the Property under any circumstances.  Therefore, even if the court were
to determine that the execution of the Substitute Trustee's Deed did not constitute a forgery, the
Foreclosure was still not effective to transfer legal title to the Property to Quigley.  And since
Quigley's conveyance to DLB could transfer to DLB no more title than Quigley had, *see BP Am.
Prod. Co. v. Marshall*, 288 S.W.3d at 463, *Rio Bravo Oil Co.*, 95 S.W.2d at 388, DLB could not
receive any interest in the Property from Quigley.[14]

As for Quigley's claim that DLB violated Texas usury laws, Quigley was incarcerated on
the date of the Hearing, and did not testify.  The record contains no evidence that the DLB Note
and the DLB Deed of Trust violated any such laws.  Quigley's usury counterclaim therefore
fails.

### III.  Conclusion

For the foregoing reasons, the court concludes (1) Quigley and Moon Shadow forfeited
all principal and interest due under the Arnold Note; (2) the Arnold Note and the Arnold Deed of
Trust are void; (3) DLB is not a bona fide purchaser for value with a superior interest in the

---

[14] The court does not suggest DLB is without remedy with respect to any damages it sustained as a result of
the loan it made to Quigley.  As noted previously, DLB purchased a title insurance policy from Lawyers
Title.  The court questions whether a title company performing even minimal due diligence would not have
unearthed the tangled web of deception surrounding the Foreclosure.

Property; and (4) Quigley's counterclaims are without merit. Counsel for Plaintiffs is directed to prepare an order reflecting the court's findings and conclusions.

## IV. Appendix

Texas Constitution, article XVI, § 50:

> (a) The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for:
> . . .
>
> (6) an extension of credit that:
>
> (A) is secured by a voluntary lien on the homestead created under a written agreement with the consent of each owner and each owner's spouse;
>
> (B) is of a principal amount that when added to the aggregate total of the outstanding principal balances of all other indebtedness secured by valid encumbrances of record against the homestead does not exceed 80 percent of the fair market value of the homestead on the date the extension of credit is made;
>
> (C) is without recourse for personal liability against each owner and the spouse of each owner, unless the owner or spouse obtained the extension of credit by actual fraud;
>
> (D) is secured by a lien that may be foreclosed upon only by a court order;
>
> (E) does not require the owner or the owner's spouse to pay, in addition to any interest, fees to any person that are necessary to originate, evaluate, maintain, record, insure, or service the extension of credit that exceed, in the aggregate, three percent of the original principal amount of the extension of credit;
>
> (F) is not a form of open-end account that may be debited from time to time or under which credit may be extended from time to time unless the open-end account is a home equity line of credit;
>
> (G) is payable in advance without penalty or other charge;
>
> (H) is not secured by any additional real or personal property other than the homestead;
>
> (I) is not secured by homestead property that on the date of closing is designated for agricultural use as provided by statutes governing property tax, unless such homestead property is used primarily for the production of milk;

(J) may not be accelerated because of a decrease in the market value of the homestead or because of the owner's default under other indebtedness not secured by a prior valid encumbrance against the homestead;

(K) is the only debt secured by the homestead at the time the extension of credit is made unless the other debt was made for a purpose described by Subsections (a)(1)-(a)(5) or Subsection (a)(8) of this section;

(L) is scheduled to be repaid:

(i) in substantially equal successive periodic installments, not more often than every 14 days and not less often than monthly, beginning no later than two months from the date the extension of credit is made, each of which equals or exceeds the amount of accrued interest as of the date of the scheduled installment; or

(ii) if the extension of credit is a home equity line of credit, in periodic payments described under Subsection (t)(8) of this section;

(M) is closed not before:

(i) the 12th day after the later of the date that the owner of the homestead submits a loan application to the lender for the extension of credit or the date that the lender provides the owner a copy of the notice prescribed by Subsection (g) of this section;

(ii) one business day after the date that the owner of the homestead receives a copy of the loan application if not previously provided and a final itemized disclosure of the actual fees, points, interest, costs, and charges that will be charged at closing. If a bona fide emergency or another good cause exists and the lender obtains the written consent of the owner, the lender may provide the documentation to the owner or the lender may modify previously provided documentation on the date of closing; and

(iii) the first anniversary of the closing date of any other extension of credit described by Subsection (a)(6) of this section secured by the same homestead property, except a refinance described by Paragraph (Q)(x)(f) of this subdivision, unless the owner on oath requests an earlier closing due to a state of emergency that:

(a) has been declared by the president of the United States or the governor as provided by law; and

(b) applies to the area where the homestead is located;

(N) is closed only at the office of the lender, an attorney at law, or a title company;

(O) permits a lender to contract for and receive any fixed or variable rate of interest authorized under statute;

(P) is made by one of the following that has not been found by a federal regulatory agency to have engaged in the practice of refusing to make loans because the applicants for the loans reside or the property proposed to secure the loans is located in a certain area:

(i) a bank, savings and loan association, savings bank, or credit union doing business under the laws of this state or the United States;

(ii) a federally chartered lending instrumentality or a person approved as a mortgagee by the United States government to make federally insured loans;

(iii) a person licensed to make regulated loans, as provided by statute of this state;

(iv) a person who sold the homestead property to the current owner and who provided all or part of the financing for the purchase;

(v) a person who is related to the homestead property owner within the second degree of affinity or consanguinity; or

(vi) a person regulated by this state as a mortgage broker; and

(Q) is made on the condition that:

(i) the owner of the homestead is not required to apply the proceeds of the extension of credit to repay another debt except debt secured by the homestead or debt to another lender;

(ii) the owner of the homestead not assign wages as security for the extension of credit;

(iii) the owner of the homestead not sign any instrument in which blanks relating to substantive terms of agreement are left to be filled in;

(iv) the owner of the homestead not sign a confession of judgment or power of attorney to the lender or to a third person to confess judgment or to appear for the owner in a judicial proceeding;

(v) at the time the extension of credit is made, the owner of the homestead shall receive a copy of the final loan application and all executed documents signed by the owner at closing related to the extension of credit;

18

(vi) the security instruments securing the extension of credit contain a disclosure that the extension of credit is the type of credit defined by Section 50(a)(6), Article XVI, Texas Constitution;

(vii) within a reasonable time after termination and full payment of the extension of credit, the lender cancel and return the promissory note to the owner of the homestead and give the owner, in recordable form, a release of the lien securing the extension of credit or a copy of an endorsement and assignment of the lien to a lender that is refinancing the extension of credit;

(viii) the owner of the homestead and any spouse of the owner may, within three days after the extension of credit is made, rescind the extension of credit without penalty or charge;

(ix) the owner of the homestead and the lender sign a written acknowledgment as to the fair market value of the homestead property on the date the extension of credit is made;

(x) except as provided by Subparagraph (xi) of this paragraph, the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender's or holder's obligations under the extension of credit and fails to correct the failure to comply not later than the 60th day after the date the lender or holder is notified by the borrower of the lender's failure to comply by:

(a) paying to the owner an amount equal to any overcharge paid by the owner under or related to the extension of credit if the owner has paid an amount that exceeds an amount stated in the applicable Paragraph (E), (G), or (O) of this subdivision;

(b) sending the owner a written acknowledgement that the lien is valid only in the amount that the extension of credit does not exceed the percentage described by Paragraph (B) of this subdivision, if applicable, or is not secured by property described under Paragraph (H) or (I) of this subdivision, if applicable;

(c) sending the owner a written notice modifying any other amount, percentage, term, or other provision prohibited by this section to a permitted amount, percentage, term, or other provision and adjusting the account of the borrower to ensure that the borrower is not required to pay more than an amount permitted by this section and is not subject to any other term or provision prohibited by this section;

(d) delivering the required documents to the borrower if the lender fails to comply with Subparagraph (v) of this paragraph or obtaining the appropriate signatures if the lender fails to comply with Subparagraph (ix) of this paragraph;

(e) sending the owner a written acknowledgement, if the failure to comply is prohibited by Paragraph (K) of this subdivision, that the accrual of interest and all of the owner's obligations under the extension of credit are abated while any prior lien prohibited under Paragraph (K) remains secured by the homestead; or

(f) if the failure to comply cannot be cured under Subparagraphs (x)(a) -(e) of this paragraph, curing the failure to comply by a refund or credit to the owner of $1,000 and offering the owner the right to refinance the extension of credit with the lender or holder for the remaining term of the loan at no cost to the owner on the same terms, including interest, as the original extension of credit with any modifications necessary to comply with this section or on terms on which the owner and the lender or holder otherwise agree that comply with this section; and

(xi) the lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the extension of credit is made by a person other than a person described under Paragraph (P) of this subdivision or if the lien was not created under a written agreement with the consent of each owner and each owner's spouse, unless each owner and each owner's spouse who did not initially consent subsequently consents . . . .

# # # # END OF MEMORANDUM OPINION # # # #